UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **VERTEX TOWERS, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TOWN OF FRANKLIN,**<br><br>**Defendant.** | **Civil Action No. 25-13650-FDS** |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a dispute over the proposed construction of a cell-phone tower. Plaintiff Vertex Towers LLC, a cell-tower developer, applied for a variance to permit the construction and operation of a cell tower in the Town of Franklin. The variance was denied by the Town of Franklin Zoning Board of Appeals. The complaint asserts four claims challenging the variance denial: three claims under the federal Telecommunications Act of 1996 and a claim under the Massachusetts Zoning Act. Plaintiff has now moved for summary judgment and requested that the Court order the Town to grant its variance application and all approvals and permits necessary to construct and operate the cell tower. For the reasons set forth below, the motion will be granted in part and denied in part.

## I. Background

The following facts are undisputed unless otherwise noted.

### A. Factual Background

Vertex Towers, LLC develops cell towers for cellular-service companies. (Pl. Statement

of Undisputed Material Facts, Dkt. No. 17, ¶ 1) ("Pl. SMF"). It seeks to construct a 100-foot, monopole-style cell tower at 1034 Pond Street in the Town of Franklin. (*Id.* ¶ 2). That property is located within the Single Family III Zoning District, which does not allow structures taller than 35 feet and requires a 30-foot setback. (Ex. A3, Dkt. No. 16, at 19) ("Application"). The application of Vertex for a building permit was accordingly denied by the Town's Inspection Department on September 17, 2025. (*Id.* at 6).

Thus, to construct the tower, Vertex required a use variance and a dimensional variance from the Town Zoning Board of Appeals ("ZBA"). (*Id.* at 19; Pl. SMF ¶ 2). On September 22, 2025, it filed an application for a variance with the ZBA. (Pl. SMF ¶ 2). Among other things, the application included a project narrative; filing fees; site plans; an affidavit from a radio frequency engineer; an affidavit from a site acquisition specialist; and an FAA analysis. (*Id.* ¶ 4).

The application contended that the proposal met the standard for a variance outlined in the Town's Zoning Bylaw because "a literal enforcement of the provisions of the Bylaw would prevent the Applicant from eliminating an existing gap in reliable service coverage, resulting in a potential loss of subscribers and the inability to effectively compete." (Application at 24). It contended that there were no feasible alternatives to the proposed location due to "the circumstances relating to topography of the surrounding area," which consisted of "business and industrial zones and undevelopable wetlands" and buildings that were not tall enough to support the operation of a cell tower. (*Id.*). Furthermore, the application contended that the project would "promote the public interest" by improving cell service in the Town, have a "minimal visual impact" on surrounding areas, "produce no objectional noise, glare, dust, some, fumes, odors, or effluent, and will not have any impact of traffic or circulation." (*Id.* at 24-26).

The application included a report by Jose Hernandez, a radio frequency engineer, stating the following:

> In order to meet the responsibility of providing seamless, uninterrupted service, carriers must continue to acquire interest[s] in sites for additional facilities, and [] applying for and obtaining local governmental zoning approvals to construct [their] sites in order to eliminate deficient service areas due to gaps in coverage or insufficient capacity. Any delays severely curtail carriers' ability to satisfy both mandated time requirements, and to achieve a market position that will allow [them] to compete for customers with other similar companies also issued licenses to operate in this area.
> . . . .
> In my opinion based upon substantial research and analysis, without a cell site located at or very near the proposed site, this area of Franklin, MA would not meet the typical coverage requirements for multiple wireless carriers, resulting in a substantial gap in wireless coverage.
>
> Based upon the technologies currently being deployed by wireless carriers, it is my opinion that the proposed Facility is at the minimum height necessary to satisfy the coverage objectives of multiple wireless carriers providing in the area.

(Application at 34-35) (citation modified). The report also included coverage maps showing existing coverage in the area and the improved coverage that a tower on the proposed site would provide. (*Id.* at 36-38). And the report provided an analysis showing that the radio emissions were well below the limits set forth by federal regulations, even in a "worst case scenario" where the tower was only 66 feet tall and operating at maximum capacity. (*Id.* at 39).

The application also included a report by Brendan Gill, the Director of Site Acquisition and Leasing for Vertex, stating:

> Based on my personal knowledge of the proposed Site and the [] surrounding area, there are no potential alternative candidates located within this geographically driven search ring that would be considered superior to the proposed Site. In addition, based on my experience, and in my professional opinion, the proposed [cell tower] to be located at 1034 Pond Street is the least intrusive and only available and viable alternative to adequate[ly] meet the coverage objective to fill this significant gap in coverage.

(*Id.* at 42). Maps, tables, and photos were attached to the report. (*Id.* at 43-50).

On October 23, 2025, the ZBA held a public hearing to discuss the variance application. (Pl. SMF ¶ 13). At the meeting, representatives of Vertex gave a presentation in support of the application for a variance. (Meeting Minutes, Ex. A4, Dkt. No. 16, at 63). An alternate member of the ZBA, who was ineligible to vote, stated that "reception is horrible in that area" and that the decision as to the variance "pertains to life and safety." (*Id.* at 64). He described an incident of delay in clearing an accident scene due to the lack of reception. (*Id.*). That account was disputed by another resident, who stated that his car was involved in the accident and that he and others were able to use their cell phones. (*Id.* at 65). A different resident "said they have had poor service at her house," but questioned the choice of location and "said she does not think Verizon did a very good search." (*Id.* at 66).[1]

Several residents expressed their opposition to the proposed tower, which they maintained would upset their settled expectations, affect their property values due to the stigma associated with cell towers, and impact their views given its location in a residential area. (*Id.* at 65-66). For example, one resident contended that the project "will seriously damage the value of [residents'] homes" and described cell towers as "visual polluters." (*Id.* at 66). Some residents were concerned about environmental impacts, including effects on the wetlands, trees, and birds in the area. (*Id.*). At least one resident expressed concerns about the health effects of the project.[2] One resident "noted the wide perception that cell towers are dangerous especially to

---

[1] The resident appears to have conflated Vertex with Verizon, which will use the cell tower if it is constructed. (*Id.* at 63-65).

[2] The town contends that only one resident spoke about health effects, not "several," as Vertex describes. (Def. Statement of Disputed Facts, Dkt. No. 19, ¶ 20) ("Def. SDMF"). According to the meeting minutes, Christine Toubeau "said she is concerned about the health problems" and "said there is enough information about health problems." (*Id.* at 65-66). Another resident, Mary B. Groth, "noted the wide perception that cell towers are dangerous especially to children" and "said what young family will want their children playing 38 ft. from a cell tower." (*Id.* at 66). And Jane Callaway-Tripp "said [the cell tower] is not safe; it is dangerous." (*Id.*). The latter two statements can certainly be construed as concerning health effects.

children," and "said what young family will want their children playing 38 ft. from a cell tower." (*Id.*). Several residents suggested alternative sites for a cell tower, with one resident emphasizing that "there has to be another alternative" than siting the cell tower in a residential neighborhood. (*Id.*). One resident asked for "an independent peer view" and stated that he "would like somebody else besides Vertex to tell us about the need and that this is the only solution." (*Id.* at 65).

At the close of the meeting, the ZBA voted two-to-one to deny the variance application. (*Id.* at 66-67). The entire deliberation on the matter was as follows:

> Chair Hunchard suggested continuing this item. Mr. Acevedo suggested making a motion at this time.
>
> Motion made by Robert Acevedo to deny the variance request for 1034 Pond Street for Vertex Towers, LLC. Motion seconded by Ginelle Lang. Discussion: Ms. Lang said that while she agrees they need cell service in that area, she thinks there should be more looking into alternate sites, not within that proximity to a residential house. Vote: Acevedo-YES; Lang-YES; Hunchard-NO. Chair Hunchard said this passes as there were not three votes in the affirmative.
>
> Mr. Parisi said this happens in a lot of places that people say there must be someplace else you can go, but no one says where.
>
> Building Commissioner Gus Brown asked if there was a motion made to close the public hearing. Mr. Parisi asked if there was any additional information the ZBA may want in order to make a positive decision. He said he would want to provide data to show that there is no place else.
>
> Motion made by Robert Acevedo to close the public hearing for 1034 Pond Street for Vertex Towers, LLC. Motion seconded by Ginelle Lang. Vote: Unanimous by the Board.
>
> Motion made by Robert Acevedo to approve the variance request for 1034 Pond Street for Vertex Towers, LLC. Motion seconded by Ginelle Lang. Vote: Acevedo-NO; Lang-NO; Hunchard-YES. (The motion did not pass).

(*Id.* at 66-67) (citation modified).

The ZBA issued its written decision on November 5, 2025. (ZBA Decision, Ex. A5, Dkt. No. 16, at 60). That decision stated:

> Based on the evidence and testimony presented remotely at the public hearing and the documents included with the application, the Zoning Board of Appeals entertained a motion by Robert Acevedo to: (1) grant a Variance request for 1034 Pond Street for Vertex Towers, LLC. Motion Seconded by Ginelle Lang. Vote: Acevedo-NO; Lang-NO; Hunchard-YES. . . .

(*Id.* at 61) (citation modified).

### B. Procedural Background

Plaintiff filed the complaint in this matter on December 3, 2025. The complaint asserted three counts for violations of the federal Telecommunications Act: failure to base the denial of the variance on substantial evidence contained in a written record, in violation of 47 U.S.C. § 332(c)(7)(B)(iii) ("Count 1"); relying on environmental effects of radio frequency emissions to deny the variance, in violation of 47 U.S.C. § 332(c)(7)(B)(iv); and effective prohibition of wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) ("Count 3). It also asserted a count for arbitrary, capricious, and unreasonable denial of the variance, in violation of Mass. Gen. Laws ch. 40A, § 17 ("Count 4").

Plaintiff has now moved for summary judgment in its favor.

## II. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Burt v. Board of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 510 (1st Cir. 2023) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)) (citation modified).

In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation modified). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Legal Framework

### A. State and Local Zoning Laws

The Massachusetts Zoning Act authorizes individual cities and towns to pass zoning bylaws, and describes the limits of that authority and the manner in which it may be exercised. *See* Mass. Gen. Laws ch. 40A, § 1 *et seq*. The Zoning Act allows towns to regulate the maximum and minimum dimensions of structures and lots allowed in certain zoned areas. It also allows towns to regulate the uses to which land in a given area may be put. A town's zoning ordinance or bylaw may provide that a particular use is allowed in an area, allowed only by special permit, or not allowed at all. The Town has such a bylaw in effect. *See generally* Town of Franklin Zoning Bylaw.

Where a use is allowed in a district by special permit, an applicant can seek such a permit from the special permit granting authority, which can be "the board of selectmen, city council, board of appeals, planning board, or zoning administrators as designated by zoning ordinance or by-law for the issuance of special permits." Mass. Gen. Laws. Ch. 40A, § 1A. The Town's zoning bylaw names the ZBA as the special permit granting authority. Town of Franklin Zoning Bylaw § 185-45(e). It establishes a "Wireless Communications Service District" in which cell

towers can be located upon the issuance of a special permit by the ZBA. *Id.* § 185-44(d). Plaintiff did not apply for a special permit, nor does defendant contend that it should have.[3]

Where a particular use is not allowed in a district, a town's permit-granting authority nevertheless has the power to grant a variance. Mass. Gen. Laws. Ch. 40A, § 10. The Zoning Act provides that the permit granting authority may grant:

> with respect to particular land or structures a variance from the terms of the applicable zoning ordinance or by-law where such permit granting authority specifically finds that owing to circumstances relating to the soil conditions, shape, or topography of such land or structures and especially affecting such land or structures but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of the ordinance or by-law would involve substantial hardship, financial or otherwise, to the petitioner or appellant, and that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of such ordinance or by-law.

*Id.* Under Massachusetts law, the "'circumstances relating to the soil conditions, shape, or topography of such land' . . . must be the reason for any substantial hardship to the owner. Unless circumstances relating to the soil conditions of the land, the shape of the land, or topography of the land cause the hardship, no variance may be granted lawfully." *Tsagronis v. Bd. of Appeals of Wareham*, 415 Mass. 329, 331 (1993).

The Town's zoning bylaw grants the ZBA authority to "hear and decide petitions for variances." Town of Franklin Zoning Bylaw, § 185-45(d)(2)(b). The three requirements for a variance in the Town's zoning bylaw mirror those of the Zoning Act: (1) "[a] literal enforcement of the provisions of this chapter would involve a substantial hardship, financial or otherwise, to the petitioner or appellant"; (2) "[t]he hardship is owing to circumstances relating to the soil conditions, shape or topography of such land or structures and especially affecting such land or

[3] Presumably, that is because the asserted coverage gap would not be remedied by another tower in the Wireless Communications Service District.

structures but not affecting generally the zoning district in which it is located"; and (3) "[d]esirable relief may be granted without either (a) [s]ubstantial detriment to the public good; or (b) [n]ullifying or substantially derogating from the intent or purpose of this chapter." *Id.*

**B. The Federal Telecommunications Act**

Overlaid on top of state and local zoning laws are the requirements of the federal Telecommunications Act ("TCA"). The TCA "imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification" of telecommunications facilities. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115-16 (2005). It provides, among other things, as follows:

> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
>
> > (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
> >
> > (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>
> (ii) A state or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.
>
> (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
>
> (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(i)-(iv). The TCA preempts state and local laws to the extent they

conflict. *Brehmer v. Planning Bd. of Wellfleet*, 238 F.3d 117, 121-22 (1st Cir. 2001). The TCA further provides that, other than the enumerated limitations, "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

Finally, the TCA provides a private right of action:

> Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis.

*Id.* § 332(c)(7)(B)(v). The First Circuit has held that "a zoning board's decision is a final action" such that an aggrieved party does "not need to seek judicial review under state law of that board decision" before bringing an action in federal court. *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 47 (1st Cir. 2009).

## IV. Analysis

### A. Count 1: Substantial Evidence

The TCA requires that a zoning authority's denial of an application to construct a cell tower be (1) "in writing" and (2) "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Here, the ZBA's decision to deny the variance application meets the "in-writing" requirement. (Application at 60-61). Thus, the issue is whether the decision was "supported by substantial evidence."

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account 'contradictory evidence in the record.'" *American Towers LLC v. Town of Shrewsbury*, 2018 WL 3104105, at *7 (D. Mass. June 22,

2018) (quoting *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 50 (1st Cir. 2012)). The First Circuit "has indicated that the appropriate standard for evaluating whether substantial evidence supports a zoning board's decision is the relevant state-law standard for granting a variance." *Id.* at *9. To satisfy the substantial-evidence requirement, "the reasons for denying an application 'need not be elaborate or even sophisticated, but rather . . . simply clear enough to enable judicial review.'" *Id.* (quoting *T. Mobile South LLC v. City of Roswell*, 574 U.S. 293, 302 (2015)). A local zoning authority is not required to make formal findings of fact or conclusions of law in its written decision, nor must it state every fact in the record that supports its decision. *Id.*; *see Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 20-21 (1st Cir. 2002). Nevertheless, "a flexible standard is not the same as no standard at all. In particular, a board must provide the reasons for its decision; merely reciting the bylaw is insufficient to comply with the substantial-evidence requirement." *Id.*

When reviewing the denial under the substantial-evidence standard, the court "must consider the written record as a whole, and is limited to the administrative record before the board." *Shrewsbury*, 2018 WL 3104105, at *7. The court can examine "more than the writing that conveys the denial if the 'reasons are sufficiently clear and are provided or made accessible to the applicant essentially contemporaneously with the written denial letter or notice.'" *Id.* (quoting *Roswell*, 574 U.S. at 295).

Here, the written decision reported the votes of the ZBA members (one for, two against), but provided no further explanation. Defendant admits that "the written Decision does not identify specifically the bases for the denial," but contends that "[t]he discussions and presentations, along with the minutes, contain evidence supporting the denial." (Def. SDMF

¶ 27).[4] While the substantial-evidence requirement is not violated simply because the zoning authority fails to specify the reasons for the denial in its written decision, it must still "clearly disclose[]" the basis for its decision such that the court is "advised of the considerations underlying the action under review." *Roswell*, 574 U.S. at 295 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). That did not occur here.

The only possible indication of the basis for the ZBA's decision is the statement of board member Ginelle Lang during the hearing that "while she agrees they need cell service in that area, she thinks there should be more looking into alternate sites, not within that proximity to a residential house." (Application at 66). As in *Shrewsbury*, "[t]he Board did not address whether the topography at issue created a hardship." 2018 WL 3104105, at *12. Likewise, "[t]here was no explanation of how the tower derogated from the purpose of the bylaw. And there was no statement—not even a single sentence—to describe how the particular circumstances here did not amount to an undue hardship." *Id.* Thus, the ZBA did not sufficiently justify its denial of the variance to allow for judicial review.

Furthermore, even assuming that the meeting minutes could qualify as "substantial evidence," they are insufficient. Plaintiff's application for a variance contended that there was a coverage gap, which, if left unremedied, would lead to the loss of subscribers and impair its ability to compete. It contended that the coverage gap was the result of the topography of the surrounding area. And it contended that the proposed cell tower would not harm the public or derogate from the purpose of the zoning scheme because it would improve cell service, produce no nuisances, and have as minimal a visual impact as possible. To support its contentions,

[4] In its brief in opposition, defendant did not contest plaintiff's arguments concerning the lack of substantial evidence. And at the motion hearing, it conceded that the basis for the decision was unclear and argued that remand was appropriate to clarify the confusion.

plaintiff submitted the report of an independent radio frequency engineer, accompanied by coverage maps. That report offered the opinion that there was a substantial coverage gap that could lead to a loss of subscribers for a cell carrier and a reduced ability to compete, and that the coverage gap would be filled by the proposed cell tower. Plaintiff also provided the report of its director of site acquisition and leasing, along with supporting documentation, which opined that there were no other viable alternatives to remedy the coverage gap. In short, plaintiff's assertions addressed the requirements for a variance under the Zoning Act and the Town's zoning bylaw.

Members of the public challenged plaintiff's assertions during the hearing. Two residents stated that they had experienced poor cell service, while one resident disputed the asserted coverage gap. Several residents maintained, in general terms, that there were alternative locations or strategies that could be used to address the asserted coverage gap. And several residents opined that the cell tower would affect property values and have adverse visual effects.[5]

As an initial matter, "the fact that members of the public oppose a cell tower does not constitute 'substantial evidence'" where "public opposition is not, by itself, a permissible consideration under [the town's] zoning bylaws." *Vertex Tower Assets, LLC v. Town of Canton*, 731 F. Supp. 3d 174, 192 (D. Mass. 2024). Moreover, courts have found anecdotes, general skepticism, and conclusory assertions insufficient to defeat expert reports in TCA cases. *See id.* at 191 ("When, as here, an applicant has presented an engineering report showing a coverage gap and detailing efforts to minimize intrusion, mere expressions of doubt, without more, cannot

[5] Some residents also expressed health and safety concerns about the proposed cell tower. However, such concerns cannot constitute substantial evidence under the TCA. *See* 47 U.S.C. § 332(c)(7)(iv); *see also Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 558 (S.D.N.Y. 2009) ("The unsubstantiated concerns of the general public—especially on a matter that has been expressly preempted by federal law—do not constitute 'substantial evidence.'").

amount to 'substantial evidence.'"); *T-Mobile Northeast LLC v. City of Lawrence*, 755 F. Supp. 2d 286, 292 (D. Mass. 2010) ("[T]he Board improperly ignored the only available expert testimony on the issue. Unscientific, anecdotal evidence will not suffice to controvert the plaintiff's evidence of a coverage gap."); *New York SMSA Ltd. P'ship v. Village of Floral Park Bd. of Trs.*, 812 F. Supp. 2d 143, 157 (E.D.N.Y. 2011) ("[A]lthough a few residents raised concerns about property values, these were simply conclusory assertions that property values would decrease, which do not amount to substantial evidence.").

The statements of residents at the hearing therefore do not support a reasonable inference that plaintiff has failed to meet the state and local standards for a variance. In particular, they do not provide substantial evidence that there is no substantial hardship, that the hardship does not result from topographical conditions, or that granting the variance would be detrimental to the public interest or a derogation from the zoning scheme.

In sum, there is no dispute of material fact as to whether the ZBA's decision is supported by substantial evidence. Accordingly, the motion for summary judgment will be granted as to Count 1.

**B. Count 2: Environmental Effects of Radio Frequency Transmissions**

The TCA prohibits zoning authorities from denying permission to construct cell towers "on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(iv). Here, plaintiff put forth the report of the radio frequency engineer stating that the proposed cell tower would comply with FCC emissions limits. That evidence was not disputed at the hearing. Therefore, the question is whether the denial was based on the health or environmental effects of radio emissions.

Plaintiff contends that the ZBA's failure to specify its reasons for denying the variance, along with the statements of residents about health effects, means that "[t]he health-related aspects of the public testimony is inextricably and impermissibly bound with the denial." (Pl. Memorandum in Support of Mot. for Summary Judgment, Dkt. No. 16, at 11) ("Pl. Memo"). It cites *Town of Canton* for the proposition that "[t]he absence of any identified basis for denying Vertex's application leaves open the inference that ZBA members did in fact deny the application for improper reasons." 731 F. Supp. 3d at 194. While that may be an entirely reasonable inference, to grant summary judgment on that basis would require that no other reasonable inference is permissible. The Court cannot so conclude.

In *Town of Canton*, the court considered similar arguments made by the plaintiff. *See id.* at 193 ("Vertex notes that the record of the ZBA's proceedings reflects abutters' expressions of concern about health effects that might be associated with the proposed tower. Because the ZBA 'gave no other reason to deny the Application,' Vertex argues, the ZBA's denial is 'inextricably bound' with the 'impermissible health-related aspect' of that notation in the decision."). The court rejected that contention because "[a]lthough Vertex points to the ZBA's mention of health effects in its written decision, the ZBA did not actually cite the abutters' 'concerns regarding public health' as the reason for its denial." *Id.* at 194. Here, the ZBA did not cite health reasons (or any reason at all) for denying the application and at no point noted potential health effects. Where there is such a "lack of clarity as to what the [] ZBA did consider," summary judgment for plaintiff is inappropriate. *Id.*; *see also T-Mobile Northeast LLC v. Town of Barnstable*, 2020 WL 3270878, at *8 (D. Mass. June 17, 2020) (denying plaintiff's motion for summary judgment where the "[c]ourt cannot conclude that the denials . . . were improperly based upon environmental concerns" because "[t]he ZBA did not mention environmental concerns or public

opposition in its denial”).

Accordingly, the motion for summary judgment will be denied as to Count 2.

**C. Count 3: Effective Prohibition**

The TCA provides that “[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services.” 47 U.S.C. § 332(c)(7)(B)(i).

The carrier bears the burden of demonstrating that there is an effective prohibition of cell services. *Omnipoint Holdings v. City of Cranston*, 586 F.3d 38, 48 (1st Cir. 2009). The court must “(1) find a ‘significant gap’ in coverage exists in an area and (2) consider whether alternatives to the carrier’s proposed solution to that gap mean that there is no effective prohibition.” *Id.* Factors to consider in evaluating the first prong include “inter alia, the physical size of the gap, the area in which there is a gap, the number of users the gap affects, and whether all of the carrier’s users in that area are similarly affected by the gaps,” along with “data about percentages of unsuccessful calls or inadequate service during calls in the gap area.” *Id.* at 49. As to the second prong, there is “no general rule classifying what is an effective prohibition. It is a case-by-case determination.” *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 58 (1st Cir. 2012) (quoting *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 630 (1st Cir. 2002)). Nevertheless, a denial of an application can constitute an effective prohibition if it “is the only feasible plan” and “further reasonable efforts are so likely to be fruitless that it is a waste of time even to try.” *Id.* (quoting *Town of Amherst v. Omnipoint Commc’ns Enters., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999)).

In conducting the effective-prohibition inquiry, the court "determines [the issue] without any deference to the local regulatory authority." *Id.* (citation modified). Unlike with substantial-evidence review, the court "may rely on 'evidence presented in court that is outside of the administrative record compiled by the local authority.'" *Id.* (quoting *Nat'l Tower*, 297 F.3d at 22).

Here, plaintiff has submitted an expert report (to the ZBA and this Court) concerning the existence of a coverage gap. Defendant contends that plaintiff "does not set out why or how those materials established any gaps in coverage." (Def. Opposition to Pl. Mot. for Summary Judgment, Dkt. No. 20, at 6) ("Def. Opp."). The report of the radio frequency engineer offered the opinion that, "without a cell site located at or very near the proposed site, this area of Franklin, MA would not meet the typical coverage requirements for multiple wireless carriers, resulting in a substantial gap in wireless coverage." (Application at 35). The maps show a coverage gap of about 1.5-2 square miles that the proposed tower would fill, setting the coverage standard at -85dBm. (*Id.* at 38).[6]

In short, plaintiff has produced evidence only about the physical size and features of the coverage gap. Some courts have found similarly sized gaps significant, although usually in a densely populated or heavily travelled area. *See, e.g.*, *Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 84 F. Supp. 3d 274, 299-300 (S.D.N.Y. 2015), *aff'd*, 632 F. App'x 1 (2d Cir. 2015). But plaintiff has not offered evidence concerning the population density of the affected area or the percentage of unsuccessful calls in the area. While the *Cranston* factors need not each be independently satisfied, it is difficult to assess whether a coverage gap is significant

[6] The First Circuit has described a similar standard of -84 dBm as "reasonable on its face." *See Cranston*, 596 F.3d at 49 (finding that "considering the provider's defined level of acceptable service on the question of the existence of a significant gap" was not clearly erroneous).

without some information about the number of cell-phone users affected by it. *See Industrial Tower & Wireless, LLC v. Haddad*, 109 F. Supp. 3d 284, 301-02 (D. Mass 2015) ("Whether a 'gap' constitutes a 'significant gap' depends not only upon its physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap. Since wireless services, unlike more traditional communications industries, are used while in transit, a gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac.") (quoting *Omnipoint Commc'ns MB Operations, LLC v. Town of Lincoln*, 107 F. Supp. 2d 108, 119 (D. Mass. 2000)) (citation modified).[7]

Because plaintiff has not satisfied the threshold requirement of showing that there is a significant coverage gap, the Court need not reach the second prong of the effective-prohibition test. In sum, plaintiff has failed to meet its burden of showing that there is no dispute of material fact as to whether the variance denial amounts to an effective prohibition of cellular services. Accordingly, its motion for summary judgment will be denied as to Count 3.

**D. Count 4: Arbitrary and Capricious Denial Under Massachusetts Law**

---

[7] Plaintiff contends that "[c]overage maps and analysis from RF engineers are sufficient evidence to establish the existence of a service gap." (Pl. Memo at 12 n.3). But the cases it cites are inapt, and in fact support the Court's emphasis on consumer data.

*Cranston* upheld the district court's finding of a significant coverage gap on clear-error review. 586 F.3d at 48-50. There, the district court received evidence that the coverage cap was on a "highly traveled road" that "connects Cranston, Coventry, and Warwick." *Omnipoint Holdings, Inc. v. City of Cranston*, 2008 WL 8192938, at *3 (D.R.I. Oct. 23, 2008). In *Green Mountain*, the First Circuit affirmed as to the coverage-gap issue because "[t]he district court found—and the parties do not contest—that there remains a significant gap in T-Mobile US's service." 750 F.3d at 40. In fact, the district court emphasized that the area was "a stretch of heavily traveled highway along which some 160,000 to 170,000 vehicles pass every day," which, combined with data about the percentage of dropped calls in the area, supported its finding of a significant coverage gap. *Green Mountain Realty Corp. v. Leonard*, 2013 WL 4804933, at *12 (D. Mass. Sept. 6, 2013).

And *Lawrence* did not address the effective-prohibition claim at all, because it issued an injunction based on the violation of the substantial-evidence requirement. 755 F. Supp. 2d at 292. The language plaintiff presumably relies on is the court's analysis of the substantial-evidence count, where the existence of uncontested expert reports suggests the ZBA's failure to adequately justify its decision. *See id.* In fact, this Court cited that language in its substantial-evidence analysis above, because "[t]he two different types of claims (that is, effective prohibition and failure to provide substantial evidence) are judged according to different standards, and on a different record." *Shrewsbury*, 2018 WL 3104105, at *11.

### 1. **Jurisdiction**

Before assessing the merits of Count 4, the Court must first determine whether it has jurisdiction to decide the state-law claim. Another session of this Court has found that it lacked supplemental jurisdiction to consider a claim under the Zoning Act due to its reading of § 332(c)(7)(A), which provides that "[e]xcept as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). It interpreted that language as a "manifested limitation" on federal jurisdiction to review local zoning decisions in TCA cases. *Nextel Commc'ns of Mid-Atl., Inc. v. Town of Wayland*, 231 F. Supp. 2d 396, 410 (D. Mass. 2002).

However, this Court believes that § 332(c)(7)(A) does not concern jurisdiction. The provision, contained in a section entitled "[p]reservation of local zoning authority," 47 U.S.C. § 332(c)(7), is better read as a rule of construction that reaffirms the traditional land-use powers of state and local zoning authorities. The Supreme Court has described § 332(c)(7)(A) as a "saving clause." *City of Arlington v. FCC*, 569 U.S. 290, 294 (2013); *c.f. Pinney v. Nokia*, 402 F.3d 430, 458 (4th Cir. 2005) ("These savings clauses [of the TCA] counsel against any broad construction of the goals of § 332 and § 332(c)(7) that would create an implicit conflict with state tort law."). Moreover, the TCA does speak with clarity as to jurisdiction in other provisions. *See* 47 U.S.C. § 332(c)(7)(B)(v); *see also id.* § 252(e)(4) ("No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section."). That further weighs against a jurisdictional interpretation. *See Santos-Zacaria v. Garland*, 598 U.S. 411, 418 (2023) ("[A] second feature of the statute compounds our doubt that § 1252(d)(1) qualifies as a jurisdictional rule: [t]hat provision's language differs

substantially from more clearly jurisdictional language in related statutory provisions."). Finally, the clear-statement rule precludes a jurisdictional interpretation of § 332(c)(7) because, even if a jurisdictional reading is plausible, it is not the only plausible construction. *See Santos-Zacaria*, 598 U.S. at 416-17 ("We treat a rule as jurisdictional only if Congress clearly states that it is. And where multiple plausible interpretations exist—only one of which is jurisdictional—it is difficult to make the case that the jurisdictional reading is clear.") (citation modified).

In sum, § 332(c)(7)(A) does not preclude the exercise of supplemental jurisdiction over the arbitrary-and-capricious claim under the Zoning Act. Here, the Court has supplemental jurisdiction over plaintiff's state-law claim because substantial-evidence review under the TCA and arbitrary-and-capricious review under the Zoning Act "are so related . . . that they form part of the same case or controversy." 28 U.S.C. 1367(a). *See, e.g.*, *Cellco P'ship v. Town of Grafton*, 336 F. Supp. 2d 71, 86 (D. Mass. 2004); *Cellco P'ship v. Town Plan & Zoning Comm'n of Town of Farmington*, 3 F. Supp. 2d 178, 186 (D. Conn. 1998); *Glob. Tower Assets, LLC v. Town of Mount Vernon*, 22 F. Supp. 3d 47, 58 (D. Me. 2014).

**2. <u>Filing Deadline</u>**

The Zoning Act authorizes a court to set aside a zoning authority's decision "if it is based on a legally untenable ground or is unreasonable, whimsical, capricious, or arbitrary." *Grafton*, 336 F. Supp. 2d at 86.[8] The statute provides:

> Any person aggrieved by a decision of the board of appeals or any special permit granting authority or by the failure of the board of appeals to take final action concerning any appeal, application or petition within the required time or by the failure of any special permit granting authority to take final action concerning any application for a special permit within the required time, whether or not previously a party to the proceeding, or any municipal officer or board may appeal to the land court department, the superior court department in which the land concerned is situated . . . by bringing an action within twenty days after the

[8] Plaintiff moved for summary judgment on all counts, but did not brief the state-law count at any point. Nevertheless, the Court will proceed with its analysis.

> decision has been filed in the office of the city or town clerk. . . . Notice of the action with a copy of the complaint shall be given to such city or town clerk so as to be received within such twenty days. The complaint shall allege that the decision exceeds the authority of the board or authority, and any facts pertinent to the issue, and shall contain a prayer that the decision be annulled. . . . There shall be attached to the complaint a copy of the decision appealed from, bearing the date of filing thereof, certified by the city or town clerk with whom the decision was filed.
>
> . . . .
> The court shall hear all evidence pertinent to the authority of the board or special permit granting authority and determine the facts, and, upon the facts as so determined, annul such decision if found to exceed the authority of such board or special permit granting authority to make such other decree as justice and equity may require.

Mass. Gen. Laws ch. 40A, § 17. Another session of this Court has found that the requirements for seeking judicial review in § 17 apply in federal court under the test set forth in *Hanna v. Plumer*, 380 U.S. 460 (1965):

> Moreover, for purposes of the *Erie* doctrine, because refusal by a federal court to apply the state rule would encourage forum shopping by non-residents appealing local zoning decisions and, in effect, give a broader right to appeal to those who can bring diversity actions in federal court than to those whose resort would be limited to the state courts, the policies underlying federal application of state rules call for this Court to insist on compliance with the notice provision of § 17 to the same extent that the courts of Massachusetts would.

*Nextel Commc'ns of the Mid-Atl., Inc. v. Town of Milford*, 2001 WL 36384012, at *8 (D. Mass. Aug. 2, 2001); *see also Farmington*, 3 F. Supp. 2d at 186 (applying the fifteen-day period for filing an appeal under Connecticut law instead of the thirty-day time period to file an action in federal court under the TCA).

Here, the ZBA issued its written decision on November 5, 2025, and plaintiff filed its complaint in federal court on December 3, 2025. Therefore, plaintiff commenced the present action more than twenty days after the filing of the ZBA decision, in violation of the Zoning Act. *See id.* ("The Massachusetts courts require strict compliance with the notice provision set out in

§ 17; failure to comply results in dismissal of the appeal.") (citation modified); *Bingham v. City Council of Fitchburg*, 52 Mass. App. Ct. 566, 569 (2001) ("Failures in meeting the twenty-day deadline are not forgiven. . . . Thus, if the required notice was not received within twenty days, the appeal should be dismissed.").

Accordingly, plaintiff's motion for summary judgment will be denied as to Count 4.

## V. **Remedy**

Plaintiff requests that the court issue an injunction ordering the ZBA to grant the variance and all other permits and approvals required to construct and operate the proposed cell tower. (Pl. Memo at 14). Defendant contends that the Court should remand the action to the ZBA for further proceedings, given the open questions of fact. (Def. Opp. at 4-5).

"[I]njunctions are the preferred form of relief under the TCA." *Shrewsbury*, 2018 WL 3104105, at *13. That is because "[t]he statutory requirements that the board act within 'a reasonable period of time,' and that the reviewing court hear and decide the action 'on an expedited basis,' indicate that Congress did not intend multiple rounds of decisions and litigation." *Nat'l Tower*, 297 F.3d at 21. Nevertheless, the TCA does not require "*automatic* injunctive relief," especially where the only finding is that the zoning authority's decision is not supported by "substantial evidence." *Shrewsbury*, 2018 WL 3104105, at *13; *see Nat'l Tower*, 297 F.3d at 24 ("[W]e can conceive of circumstances in which a remand may be in order—for example, an instance of good faith confusion by a board that has acted quite promptly . . . .").

In this proceeding, the Court has found that there is no dispute of material fact as to the substantial-evidence count, but not as to the effective-prohibition, health-effects, and arbitrary-and-capricious counts. Therefore, the question is whether it is appropriate to issue an injunction based solely on a violation of the substantial-evidence requirement of the TCA.

*Shrewsbury* noted that most TCA injunctions were issued in cases where the court sustained both substantial-evidence and effective-prohibition claims. 2018 WL 3104105, at *13. Nevertheless, the *Shrewsbury* Court reasoned that "if it is clear that the board is hostile to an applicant and using an ambiguous or unsupported decision as cover for unreasonably obstructing a proposal, an injunction is likely appropriate." *Id.* Ultimately, the court "defer[red] consideration of what remedy is appropriate until after" the effective-prohibition claim was resolved, given that the plaintiff had moved for summary judgment only on its substantial-evidence claim, not on its effective prohibition claim. 2018 WL 3104105, at *14.

Here, all the counts have been decided. Thus, "[a] remand would add nothing to the record." *Canton*, 731 F. Supp. 3d at 196. In fact, given the ZBA's complete lack of reason-giving, remand would only allow it to "present a moving target," in contravention of Congress's aim of promoting speedy resolution of TCA cases. *Nat'l Tower*, 297 F.3d at 22.

Likewise, there is no indication of "good-faith confusion," *Nat'l Tower*, 297 F.3d at 24, because there is no basis for understanding what the ZBA could have been confused about. That is also unlike *Shrewsbury*, where "the court remanded a board decision where the record reflected significant consideration of aesthetic character, but the written decision, which consisted of an unadorned citation of the relevant by-law, fell short." *Canton*, 731 F. Supp. 3d at 196. As discussed above, the only apparent deliberation by the ZBA was Lang's comment "that while she agrees they need cell service in that area, she thinks there should be more looking into alternate sites, not within that proximity to a residential house." (Application at 66). An attorney for plaintiff then "asked if there was any additional information the ZBA may want in order to make a positive decision. He said he would want to provide data to show that there is no place else." (*Id.* at 67). The ZBA appears to have completely ignored that comment and instead

moved immediately to vote on the variance request. (*Id.*). The meeting minutes thus suggest quite the opposite of "good faith confusion," and instead indicate that "the board is not prepared to permit construction" such that "any further reasonable efforts by [plaintiff] are so likely to be fruitless that it is a waste of time even to try." *Nat'l Tower*, 297 F.3d at 24-25.

Accordingly, the TCA's default remedy of an injunction is warranted here. The Court will order the ZBA to grant the variance and issue all approvals and permits necessary to construct and operate the proposed cell tower.

## VI. Conclusion

For the foregoing reasons, the motion for summary judgment is GRANTED as to Count 1 and DENIED as to Counts 2, 3, and 4. Defendant is hereby directed to, within 42 days of this order, take all steps necessary to authorize plaintiff to construct and operate the proposed cell tower, including, but not limited to, issuing variances, special permits, and building permits.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: October 19, 2026